UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

DRUCKZENTRUM HARRY JUNG       )
GmbH & Co. KG,                )
                             )
          Plaintiff,         )     Case No. 09-cv-7231
                             )
     v.                      )     Judge John W. Darrah
                             )
MOTOROLA, INC.,              )
                             )
          Defendant.         )

## MEMORANDUM OPINION AND ORDER

Druckzentrum Harry Jung GmbH & Co. KG ("Druckzentrum") brings this action against Motorola, Inc. ("Motorola"), alleging breach of contract and fraudulent misrepresentation in connection with Motorola's entering into and terminating a contract with Druckzentrum. After Motorola moved to dismiss Druckzentrum's original complaint, Druckzentrum sought, and was granted, leave to file an amended complaint. Motorola's Motion to Dismiss the Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) is presently before the Court. As discussed below, the Motion is granted in part and denied in part.

## BACKGROUND

The following facts are taken from the allegations in Druckzentrum's Amended Complaint and are accepted as true for purposes of deciding this Motion to Dismiss.[1]

---

[1] Druckzentrum's Amended Complaint contains 278 paragraphs, many of which state legal conclusions. Legal conclusions need not be accepted as true for purposes of a motion to dismiss. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

Druckzentrum is a printing company incorporated in Germany; its principal place of business is in Flensburg, Germany. (Am. Compl. ¶¶ 1, 4.) Motorola is a publicly held Delaware corporation; its principal place of business is in Schaumburg, Illinois. (Am. Compl. ¶¶ 3, 5.) Among other things, Motorola sells cell phones worldwide. (Am. Compl. ¶ 2.) Printed materials, such as user manuals and quick-start guides, are packaged with Motorola's cell phones. (Am. Compl. ¶ 3.)

From 1995 until October 2007, Druckzentrum printed cell-phone manuals for Motorola's German subsidiary for use in markets served outside the United States. (Am. Compl. ¶ 9.) During that period, Druckzentrum and Motorola's subsidiary did not use formal contracts; instead, they relied on letters of intent and oral agreements. (Am. Compl. ¶ 12.)

In September 2007, Motorola orchestrated a new bid process for the printing of cell-phone manuals outside the United States. (Am. Compl. ¶ 13.) This "Rapid Sourcing Initiative" ("RSI"), as it was called, involved the selection of single vendors (or a limited number of vendors) for each Motorola business region. (Am. Compl. ¶ 15.) On September 12, 2007, Motorola's Adriana Camara sent an email invitation to Roger Pilz, a Druckzentrum Sales Manager, inviting Druckzentrum to participate in Motorola's RSI process. (Am. Compl. ¶¶ 18, 21.)

On September 24, 2007, the RSI process began at Motorola's Schaumburg facility with an RFQ workshop.[2] (Am. Compl. ¶ 20.) Pilz, along with Druckzentrum's CEO, Harry Gall, participated in the RSI process on behalf of Druckzentrum. (Am. Compl. ¶ 21.) In order to compete in the RSI process, Druckzentrum was required to enter into a Corporate Supply Agreement ("CSA") with Motorola in the form provided to Druckzentrum, which could not be amended.[3] (Am. Compl. ¶ 29.) Gall executed the CSA on behalf of Druckzentrum on October 4, 2007. (Am. Compl. ¶ 30.) Motorola did not execute the agreement until January 23, 2008, when it was signed by David Buck. (Am. Compl. ¶ 31.)

During the RSI process, Druckzentrum was invited to bid on a two-year contract for 100 percent of Motorola's print needs for Motorola's EMEA (Europe, Middle East, and Africa) region. (Am. Compl. ¶ 22.) Motorola represented to Druckzentrum that the contract would be for all cell-phone manuals needed by Motorola for that region. (Am. Compl. ¶ 23.) Additionally, multiple Motorola employees told Druckzentrum that Motorola forecasted it would manufacture 37 million cell phones for the EMEA region during the first year of the contract but that Druckzentrum should prepare for production of manuals to accompany 43 million cell phones. (Am. Compl. ¶¶ 24, 138.) In

_____

[2] Druckzentrum does not define "RFQ" in its Amended Complaint or its brief in opposition to the instant Motion. It is assumed to mean "request for quotations." *See, e.g.*, Request for Quotations (RFQ) Definition, http://www.businessdictionary.com/definition/request-for-quotations-RFQ.html (last visited June 2, 2010).

[3] Each bidder also was required to execute Motorola's "Invoice on Consumption Agreement" and "Supplier Owned Inventory Agreement" as a prerequisite to participating in the bidding process. (Am. Compl. ¶ 79.) Those agreements are not at issue in the present dispute.

presenting these forecasts to Druckzentrum, Motorola knew that Druckzentrum's price would be inversely affected by the anticipated volume of purchases. (Am. Compl. ¶¶ 25-26.)

Motorola's representations as to its projected sales were false, and the employees who made those statements knew that Motorola "would not be able to come close to selling 37 million cell phones." (Am. Compl. ¶ 229.) Motorola's employees presented these false forecasts "for the purpose and intent of deceiving and defrauding" Druckzentrum and to induce Druckzentrum into contracting with Motorola using the lowest possible bid. (Am. Compl. ¶ 232.)

The instructions in the RFQ bid package received by Druckzentrum defined "Packaging and Print Spend" as the total print spend "for a calendar year in the applicable RSI award period." (Am. Compl. ¶¶ 62-63.) The RFQ also indicated that print spend would be awarded quarterly and that the "swing share" – the amount of print spend that may be awarded above the initial award – would also be determined on a quarterly basis. (Am. Compl. ¶ 64.) Druckzentrum was specifically asked to provide a bid for the printing of materials to accompany 37 million cell phones. (Am. Compl. ¶¶ 48-52.) Bidders were required to bid on *all* print products for a region; if they did not do so, their bids would be rejected. (Am. Compl. ¶ 50.)

The RFQ stated that the bid would be for a "committed" share of print spend "for the duration of the contract." (Am. Compl. ¶ 57.) Druckzentrum understood that Motorola would be obligated to allocate to Druckzentrum the volume of work reflected by the percentage stated in the bid process. (Am. Compl. ¶ 58.) Druckzentrum claims its

interpretation of the RFQ "was repeatedly confirmed by members of the Motorola team to Druckzentrum in the several bidding conferences that Motorola orchestrated." (Am. Compl. ¶ 66.) Druckzentrum also claims Motorola "implicitly" stated that a bidder would be awarded the swing share if certain quantitative and qualitative criteria were met, that Druckzentrum met those criteria, and that Motorola was thus obligated to award the swing share to Druckzentrum. (Am. Compl. ¶¶ 67-72.)

The bid package stated that "Awards made pursuant to this RFQ shall become effective October 1, 2007." (Am. Compl. ¶ 77.) On October 19, 2007, Druckzentrum submitted its print RSI bid package to Motorola. (Am. Compl. ¶ 81.) On November 15, 2007, Pilz and Gall traveled to Motorola's Libertyville, Illinois facility to further discuss Druckzentrum's bid. (Am. Compl. ¶ 88.) Druckzentrum based its proposed prices on Motorola's represented need for manuals to accompany 37 million cell phones. (Am. Compl. ¶ 129.)

On January 31, 2008, Scott Bojanoski of Motorola sent an email to Pilz at Druckzentrum, attaching a copy of a Notice of Initial Award ("NIA"), which was dated January 22, 2008. (Am. Compl. ¶ 102.) According to the NIA, Druckzentrum received an "Initial Award" of "2% of Base Share for the Print Segment with up to an additional 8% Swing Spend." (Am. Compl. Ex. B ¶ 2.) Pilz and Gall were specifically told that those figures were selected because 100 percent of EMEA print projects constituted 10 percent of Motorola's global print spend and that the purpose of the 2-10 percent spread was to share the risk between Motorola and Druckzentrum in the event that the cell-phone market performed below expectations. (Am. Compl. ¶¶ 141, 143.)

5

Several terms in the NIA were different than those provided in the RFQ: "Base Share" was now defined in terms of a "targeted percentage" rather than a "committed share"; and "Swing Spend," which provides for a potential percentage above Base Share to be awarded in Motorola's sole discretion, replaced the previously defined "Swing Share." (Am. Compl. ¶ 98.) David Buck executed the NIA on behalf of Motorola on January 23, 2008. (Am. Compl. ¶ 103.) On January 31, 2008, Gall received the signed copy of the NIA from Motorola; Gall signed it sometime thereafter.[4] (Am. Compl. ¶ 105.)

The NIA provided that the effective date of the award was October 1, 2007. (Am. Compl. ¶ 106.) However, Motorola delayed the start of the printing project by requesting additional bids from Druckzentrum on new products and by undergoing the process of severing its contract with another vendor. (Am. Compl. ¶¶ 119-120.) Ultimately, Motorola did not agree to Druckzentrum's price list until April 10, 2008. (Am. Compl. ¶ 128.) Druckzentrum was not advised that such delays would occur. (Am. Compl. ¶ 124.) During the period from October 1, 2007, through April 10, 2008, other suppliers printed millions of EMEA materials for Motorola. (Am. Compl. ¶ 131.)

In order to preserve the Initial Award conferred by the NIA, Druckzentrum was required to create or maintain the capacity required to meet Motorola's forecasted requirements. (Am. Compl. ¶ 109.) Druckzentrum relied on Motorola's representations that Druckzentrum would be the exclusive EMEA printer for 37 million products and

---

[4] A copy of the NIA attached to Druckzentrum's complaint does not contain a date under Gall's signature.

invested more than 1.5 million Euros in machinery and modifications in order to be able to maintain the necessary capacity. (Am. Compl. ¶ 139.)

On or about November 4, 2008, Motorola informed Druckzentrum that it intended to close its Flensburg facility. (Am. Compl. ¶ 171.) Despite Druckzentrum's repeated requests for a specific date of closure and a transition plan, Motorola provided neither. (Am. Compl. ¶¶ 173-178.) On March 25, 2009, Motorola informed Druckzentrum, via email, that no further orders would be placed. (Am. Compl. ¶ 180.) On April 24, 2009, Druckzentrum sent a "Notice of Cancellation" of the contract to Motorola. (Am. Compl. ¶ 182.) Motorola responded with a letter dated May 14, 2009, indicating that it had shifted its production of EMEA materials to manufacturing sites in Asia. (Am. Compl. ¶ 185.) On July 1, 2009, Motorola faxed a letter to Druckzentrum, stating that Motorola was terminating the CSA and RSI Award pursuant to CSA section 2.2(d), which allowed Motorola to terminate "for convenience upon ninety (90) days prior written notice to [Druckzentrum]." (Am. Compl. ¶ 189.)

Druckzentrum raises six claims in its Amended Complaint. Count I is for breach of contract. Counts II through V claim various theories of fraudulent misrepresentation. Count VI is for punitive damages. Motorola moves to dismiss all six counts.

## LEGAL STANDARD

"A motion under Rule 12(b)(6) challenges the sufficiency of the complaint." *Christensen v. County of Boone, Ill.*, 483 F.3d 454, 458 (7th Cir. 2007). In ruling on a motion to dismiss, the court must accept as true all well-pleaded factual allegations and draw reasonable inferences in favor of the plaintiff. *Sprint Spectrum L.P. v.*

*City of Carmel, Ind.*, 361 F.3d 998, 1001 (7th Cir. 2004). The allegations in the complaint "must plausibly suggest that the plaintiff has a right to relief, raising that possibility above a 'speculative level'; if they do not, the plaintiff pleads itself out of court." *Equal Employment Opportunity Comm'n v. Concentra Health Servs., Inc.*, 496 F.3d 773, 776 (7th Cir. 2007) (citing *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1965, 1973 n.14 (2007)).

The parties agree that the NIA is governed by Illinois law. Under Illinois law, the interpretation of an unambiguous contract is a question of law; ambiguities in the language of a contract regarding the parties' intent, however, create a question of fact. *Echo, Inc. v. Whitson Co.*, 121 F.3d 1099, 1104 (7th Cir. 1997) (*Echo, Inc.*) (citing Illinois cases). If the contract is unambiguous, a breach-of-contract claim may be subject to dismissal for failure to state a claim. *Id.* Where an exhibit to a complaint (e.g., a contract) conflicts with the allegations of the complaint, the exhibit typically controls. *Massey v. Merrill Lynch & Co.*, 464 F.3d 642, 645 (7th Cir. 2006). Thus, a plaintiff "may plead himself out of court by attaching documents to the complaint that indicate that he or she is not entitled to judgment." *Id.* (quoting *Centers v. Centennial Mortgage, Inc.*, 398 F.3d 930, 933 (7th Cir. 2005)).

## ANALYSIS

### *Count I – Breach of Contract*

There are two executed agreements at issue in this dispute: the CSA and the NIA. The CSA "applies to all direct and indirect Motorola purchases of Products and services supplied to or performed by" Druckzentrum for the two-year period beginning

8

October 1, 2007. (Am. Compl. Ex. A ¶¶ 1.1, 2.1.) The NIA "set forth the initial terms and conditions relating to [Druckzentrum's] Initial Award" and expressly incorporates certain terms and provisions from the CSA. (Am. Compl. Ex. B, p. 1.) Both agreements are governed by Illinois law (Am. Compl. ¶ 108), and both parties agree that the Illinois Commercial Code applies to the contracts at issue.

To state a claim for breach-of-contract under Illinois law, a party must allege the following: (1) that a valid contract exists; (2) that the plaintiff performed its contractual duties; (3) that the defendant breached the contract; and (4) that the plaintiff was damaged by the defendant's breach. *Priebe v. Autobarn, Ltd.*, 240 F.3d 584, 587 (7th Cir. 2001). Motorola's Motion attacks only the third and fourth elements, arguing that Druckzentrum has failed to identify any specific contractual provision that was breached by Motorola and has failed to allege that it was harmed by any perceived breaches.

Druckzentrum alleges multiple theories of recovery in its single claim for breach of contract. One theory is that Motorola promised to make Druckzentrum its exclusive printer for the EMEA region and that Motorola breached the NIA by shifting EMEA business to other suppliers after Motorola closed its Flensburg facility. To the extent Druckzentrum seeks to recover on that basis, its claim is contradicted by the plain language of the NIA and must therefore be dismissed. The language regarding Druckzentrum's Initial Award is clear: Druckzentrum was awarded a "target" of "2% of Base Share for the Print Segment with up to an additional 8% Swing Spend." The NIA contains no reference to the EMEA region and makes no claim of exclusivity.

Notwithstanding the clear NIA language, Druckzentrum maintains that Motorola's oral representations and RFQ instructions led Druckzentrum to believe that it would be the only supplier of print materials in the EMEA region. However, any alleged conversations or contrary instructions were expressly superseded by the NIA. The five-page NIA, signed by Druckzentrum's CEO, contains an express merger clause, which provides as follows: "This Agreement is the entire understanding between the parties concerning this Initial Award and supersedes all earlier discussions, agreements and representations regarding this Initial Award." (Am. Compl. Ex. B ¶ 10.)

Under Illinois's parol-evidence rule, "evidence of prior agreements or contemporaneous oral agreements is inadmissible to vary or contradict the terms of an integrated written contract." *Int'l Marketing Ltd. v. Archer-Daniels-Midland Co.*, 192 F.3d 724, 729 (7th Cir. 1999) (citing 810 ILCS 5/2-202); *accord Brooklyn Bagel Boys, Inc. v. Earthgrains Refrigerated Dough Products, Inc.*, 212 F.3d 373, 380 (7th Cir. 2000) (*Brooklyn Bagel*).

Druckzentrum cites *Brooklyn Bagel* for the proposition that "[n]otwithstanding the parol evidence rule, extrinsic evidence can be admitted to discover the parties' genuine intent when a contract is ambiguous." 212 F.3d at 380 (citation omitted). This much is true, but *Brooklyn Bagel* went on to say that "there must be either contractual language on which to hang the label of ambiguous or some yawning void . . . that cries out for an implied term." *Id.* (quoting *Bidlack v. Wheelabrator Corp.*, 993 F.2d 603, 608 (7th Cir. 1993) (*en banc*)). Druckzentrum has not alleged any relevant, ambiguous provisions in the NIA. "Extrinsic evidence cannot be used 'to create a conflict

10

completely apart from the contract itself.'" *Id.* (quoting *R.T. Hepworth Co. v. Dependable Ins. Co.*, 997 F.2d 315, 318 (7th Cir. 1993)). The *Brooklyn Bagel* court held that it would not have been proper to consider extrinsic evidence because the plaintiff had not identified any ambiguous contractual language. *Id.* It would be similarly improper to consider extrinsic evidence in this case.

Instead, Druckzentrum simply claims the NIA was incomplete because some of the NIA's terms refer to the RFQ. But those terms are not at issue; and under Illinois law, "[m]ere reference to another contract or document is not sufficient to incorporate its terms into a contract. There must be an express intent to incorporate . . . ." *Rosenblum v. Travelbyus.com Ltd.*, 299 F.3d 657, 666 (7th Cir. 2002). Druckzentrum does not allege any such express intent to incorporate the RFQ into the NIA.

Druckzentrum's claim is that Motorola provided Druckzentrum with something less than the promised "Initial Award." In claiming that "Initial Award" is reasonably subject to another interpretation, Druckzentrum essentially asks this Court to conclude that "2% of Base Share for the Print Segment with up to an additional 8% Swing Spend" could reasonably be construed to mean "100% of Base Share for the Print Segment for Europe, the Middle East, and Africa." This argument is unpersuasive.[5] Because Druckzentrum has not demonstrated any legitimate ambiguity as to the meaning of its "Initial Award," extrinsic evidence may not be considered to contradict that term.

----

[5] Moreover, even if the RFQ could be used to interpret the NIA, it does not support Druckzentrum's theory of exclusivity. The RFQ indicates that "Supplier awards will be a percentage of the total spend for the specified category" and that awards would be in one of the following "buckets:" "Major Award" (20-40 percent); "Mid Award" (10-20 percent); or "Minor Award" (2-10 percent). Nowhere does it provide that exclusive awards will be granted for any segment or region.

11

Druckzentrum also seeks to bring in extrinsic evidence on the basis that "[c]ourse of dealing, usage of trade, and course of performance may be considered to explain or supplement the terms of an agreement even without determination that the agreement is ambiguous." *See Berryman Transfer & Storage Co. v. New Prime, Inc.*, 802 N.E.2d 1285, 1289 (Ill. App. Ct. 2004) (citing 810 ILCS 5/2-202). But "course of dealing," "usage of trade," and "course of performance" are all specifically defined in the Illinois Commercial Code. *See* 810 ILCS 5/1-103. Although Druckzentrum refers to its past business transactions with Motorola (i.e., a course of dealing), none of Druckzentrum's allegations suggest that any prior transactions caused Druckzentrum to believe that "2% of Base Share for the Print Segment with up to an additional 8% Swing Spend" meant anything other than what it said. At any rate, an express agreement is controlling over a course of dealing when the course of dealing contradicts the express terms of the agreement. *Echo, Inc.*, 121 F.3d at 1102. Druckzentrum does not allege any relevant course of performance or usage of trade.

More importantly, Druckzentrum's allegations simply do not support its theory of exclusivity. Druckzentrum claims it was told that 100 percent of the EMEA region was 10 percent of the total print spend. However, Druckzentrum was not awarded 10 percent outright; it was awarded 2 percent "with up to an additional 8%." Even if 10 percent of Motorola's total print spend is equal to 100 percent of its EMEA print spend, that is not what was promised to Druckzentrum in the NIA. Accordingly, to the extent Druckzentrum's breach-of-contract claim is premised on Motorola's purported failure to

provide 100 percent of EMEA print business to Druckzentrum over the contract period, Druckzentrum has failed to state a claim for relief.

The rejection of that theory does not, however, dispose of Count I in its entirety. Motorola promised to "use good faith efforts to award Products to [Druckzentrum] that in the aggregate, are reasonably likely to achieve the target percentage identified in the Initial Award" but specifically provided that the actual percentage may vary from the target due to a variety of factors and that "Motorola is not liable, and [Druckzentrum] will have no claim against Motorola, for any percentage variance from the target percentage identified in the Initial Award." (Am. Compl. Ex. B ¶ 2.) The NIA also provided that the award would be effective October 1, 2007, and run until September 30, 2009, unless terminated earlier. (Am. Compl. Ex. B ¶¶ 1, 6.a.) Among other possible methods of termination, the NIA could be terminated by Motorola "for convenience" upon 90 days' written notice. (Am. Compl. Ex. B ¶ 6.c (incorporating CSA ¶ 2.2.d).)

Motorola did not begin placing orders until April 2008. It ceased placing orders in March 2009, after which it acknowledged that it had shifted the production of EMEA printed materials to manufacturing sites in Asia. Druckzentrum claims that Motorola did so without 90 days' written notice and, thus, cancelled its contract without following the proper termination procedures set forth in the NIA. Druckzentrum also claims that Motorola failed to provide Druckzentrum with the targeted percentage of orders, failed to make good-faith efforts to meet those targeted goals, and failed to provide a transition plan when it chose to move its business to other manufacturers.

13

Motorola contends that it can incur no liability for providing anything less than the targeted percentages because the NIA expressly provided that Motorola would not be liable, and that Druckzentrum would have no claim against Motorola, for any variances from the targets. Motorola also asserts that its aggregate purchases met the 2 percent target over the course of the period during which the NIA remained in force.[6] Additionally, Motorola argues that it provided contractually sufficient notice of termination in November 2008 by informing Druckzentrum that it would be closing its Flensburg facility at some future date.

Druckzentrum's claim that Motorola breached the NIA is sufficient to withstand a motion to dismiss. The fact that Druckzentrum was promised only a "targeted" percentage does not, as a matter of law, mean that Motorola was free to cancel the agreement without penalty at any time for any reason. Motorola was contractually obligated to make good-faith efforts to achieve those targets. Whether Motorola acted in good faith is a question of fact, as are issues concerning Motorola's reasons for ceasing orders and the actual percentage of print business given to Druckzentrum over the contractual period. At this stage, Druckzentrum's allegations regarding Motorola's failure to make good-faith efforts to provide Druckzentrum with the targeted business and Motorola's improper cancelation of the NIA sufficiently state a plausible claim for relief.

Furthermore, Druckzentrum has presented a question of interpretation regarding the frequency in which the targeted percentages were to be evaluated. Although the NIA

---

[6] It is unclear whether Motorola is aggregating purchases beginning with the effective date of the CSA and the NIA (October 1, 2007), the date on which the NIA was executed (on or about January 31, 2008), or the date on which Motorola placed the first order under the NIA (April 2008).

provides that the "Award Period" would run from October 1, 2007, through September 30, 2009, it is silent as to whether the targeted percentages would be calculated on a quarterly or aggregated basis.

Because the NIA provided that "quarter-on-quarter" price adjustments would be negotiated using the RSI process and that Motorola would re-evaluate prices based on, among other things, volume changes (Am. Compl. ¶ 112), Druckzentrum claims Motorola was obligated to make good-faith efforts to provide Druckzentrum with the targeted award on a *quarterly* basis and that Motorola failed to do so for every quarter of the contract period. Specifically, Druckzentrum alleges that Motorola failed to purchase two percent of its print materials from Druckzentrum in the last quarter of 2007 (the quarter prior to Druckzentrum's receiving and signing the NIA) and the first quarter in 2008 (the quarter prior to the parties' reaching an agreement on price).

Motorola proposes a different interpretation, arguing that the targets were to be evaluated in the aggregate over the period of the contract. Motorola notes that the NIA obligated Motorola to "use good faith efforts to award Products to [Druckzentrum] that *in the aggregate*, are reasonably likely to achieve the target percentage identified in the Initial Award" (emphasis added). The provision is ambiguous. Another reasonable interpretation of that provision is that orders for individual *products* would be aggregated, in which case the question remains as to how frequently those targets would be evaluated.

Motorola also argues that Plaintiff waived any right it may have had to 2 percent of Motorola's print spend for the first two quarters of the contract period. Druckzentrum signed the NIA in January 2008, knowing that Motorola had not placed any orders for the

preceding quarter; and Druckzentrum agreed on prices in April 2008, knowing that Motorola had not placed any orders for the first quarter of 2008. Under Illinois law, waiver occurs when a party intentionally relinquishes a known right; it may be made by an express agreement or implied from the conduct, acts, or words of the party alleged to have waived a right. *Delta Consulting Group, Inc. v. R. Randle Constr., Inc.*, 554 F.3d 1133, 1140 (7th Cir. 2009) (citations omitted). As pled, the earliest effective date of the agreement at issue was January 31, 2008 – that is the date on which Druckzentrum received Motorola's signed copy of the NIA and, thus, the earliest possible date on which Druckzentrum could have executed that agreement. Whether Druckzentrum waived its right to Motorola's business in the first quarter of 2008 by agreeing to a price list in April 2008 is a question of fact that cannot be resolved on a motion to dismiss.

Accordingly, Motorola's Motion to Dismiss Count I is denied except as specifically noted above regarding Druckzentrum's claim that Motorola breached the NIA.

### Counts II-V – Fraudulent Misrepresentation

To state a claim for fraudulent misrepresentation, Druckzentrum must allege the following: (1) Motorola made a statement of then-existing material fact (rather than a mere promise or opinion); (2) the statement was false; (3) Motorola knew that the statement was false; (4) Druckzentrum reasonably relied upon the truth of the statement; (5) Motorola made the statement for the purpose of inducing Druckzentrum to act; and (6) Druckzentrum was damaged as a result of its reliance on the statement. *LaScola v. U.S. Sprint Commc'ns*, 946 F.2d 559, 568 (7th Cir. 1991). The allegedly false statements

must generally relate to past or current facts. *Lillien v. Peak6 Invs., L.P.*, 417 F.3d 667, 671 (7th Cir. 2005). Promises or statements as to future intent cannot form the basis of a fraud allegation absent a "narrow" exception made in situations where the promise is part of a "scheme to accomplish the fraud." *Bd. of Educ. of Crete-Monee Cmty. Unit Sch. Dist. No. 201-U v. DeFrancesco*, No. 08 C 4060, 2009 WL 1108490, at *3 (N.D. Ill. Apr. 21, 2009) (citations and internal quotation marks omitted). Allegations of fraud must be supported with specific factual allegations. Fed. R. Civ. P. 9(b).

Count II alleges that specific Motorola employees told specific Druckzentrum employees on specific dates that Motorola wanted Druckzentrum to produce print materials to accompany 37 million cell phones during the first year of the contract. (Am. Compl. ¶¶ 226-228.) Druckzentrum alleges that these statements were known to be false at the time they were made and that Motorola made these statements in order to induce Druckzentrum to provide more favorable pricing. (Am. Compl. ¶¶ 229-232.) Druckzentrum also alleges that it relied on those statements in calculating its prices and seeks to recover the difference between what it was paid and what it would have charged had it known it would have been producing print materials for only 11.6 million phones. (Am. Compl. ¶¶ 233-241.) Count III presents an alternative theory of damages based on the higher amount Motorola paid Druckzentrum during the year preceding the RSI period when Druckzentrum produced materials pursuant to informal agreements with Motorola's German subsidiary.

Count IV alleges that certain Motorola employees "repeatedly told" certain Druckzentrum employees that Motorola's orders for printed materials from

Druckzentrum would increase. (Am. Compl. ¶ 246.) The statements were allegedly made "[d]uring the first year of the contract through October 2008." (Am. Compl. ¶ 246.) Druckzentrum alleges that these statements were false and made for the purpose of deceiving Druckzentrum to continue to perform under contract. (Am. Compl. ¶¶ 247-249.) Druckzentrum also alleges that it "was induced to continue printing materials for Motorola for the EMEA region at unreasonably low prices" and that it suffered damage as a result. (Am. Compl. ¶¶ 250-251.)

Count V alleges that Motorola forecasted a need for print materials to accompany 37 million phones despite having knowledge that its sales volumes were declining. (Am. Compl. ¶¶ 262-267.) Druckzentrum alleges that it was never notified as to a decline in Motorola's forecasted sales and that Motorola was contractually obligated to advise Druckzentrum of any changes in its forecasts. (Am. Compl. ¶¶ 272-273.)

Motorola does not address Druckzentrum's fraud counts individually. Instead, Motorola argues that all four of them must be dismissed because Druckzentrum failed to plead (1) an actionable misrepresentation and (2) reasonable reliance.

When all reasonable inferences are construed in Druckzentrum's favor, the allegations in the Amended Complaint sufficiently state a claim for fraudulent misrepresentation. Contrary to Motorola's position, Druckzentrum did not merely allege that Motorola provided an inaccurate forecast of its future sales. Druckzentrum alleges that Motorola knowingly provided false, inflated forecasts to Druckzentrum for the purpose of inducing Druckzentrum to provide a lower bid and enter into an agreement with Motorola. If Motorola simply misjudged its forecasts, Druckzentrum would not

18

prevail. If Motorola knowingly represented figures to Druckzentrum that were higher than its actual forecasts, such a statement would constitute, not a false promise as to future intent, but a false statement of then-existing material fact.

Druckzentrum has also sufficiently alleged reasonable reliance on Motorola's false statements. Motorola argues that such reliance could not have been reasonable because the CSA specifically provided that forecasts were nonbinding and because the NIA provided that Motorola would not be liable for any variation from the target award. Motorola also asserts that reliance on oral representations is unreasonable as a matter of law where those representations contradict an integrated, written contract. *See Cozzi Iron & Metal, Inc. v. U.S. Office Equip., Inc.*, 250 F.3d 570, 575 (7th Cir. 2001).

But Counts II through V do not claim Motorola is liable simply for failing to hit its sales forecasts, and there is no contradiction between Druckzentrum's fraud allegations and the NIA. Rather, Counts II through V allege that Motorola employees fraudulently misstated Motorola's forecasts in order to induce Druckzentrum to provide a low bid and enter into an agreement with Motorola. The fact that the forecasts are contractually nonbinding does not mean that Druckzentrum could not have relied on Motorola's false statements to enter the contract in the first place. Indeed, "[t]o hold that an integration clause in a fraudulently induced contract precludes a fraud-based challenge to the contract is illogical and would also provide a blueprint for defrauding parties to shield their wrongdoing." *Am. Hardware Mfrs. Ass'n v. Reed Elsevier Inc.*, No. 03 C 9421, 2005 WL 3236590, at *5 (N.D. Ill. Feb. 13, 2007). In any event, whether

19

reliance is reasonable is generally a question of fact. *Id.* at *6. Here, Druckzentrum has sufficiently pled allegations of fraud sufficient to withstand a motion to dismiss.

*Count VI – Punitive Damages*

In Count VI, Druckzentrum alleges that Motorola's intentional conduct and breach of good-faith obligations nullify the CSA's prohibition against punitive damages. Although a plaintiff may not plead a separate cause of action for punitive damages under Illinois law, *see Smith v. St. James Hosp. & Health Centers*, 02 C 2953, 2003 WL 174195, at *2 (N.D. Ill. Jan. 27, 2003), Motorola does not argue that punitive damages are legally unavailable on Druckzentrum's fraud claims; and its effort to dismiss this claim elevates form over substance. The proper procedure would have been for Druckzentrum to include a request for punitive damages in a prayer for relief (rather than as a freestanding count). However, Druckzentrum has put Motorola on notice of its intent to seek punitive damages on its fraud claims. The motion to dismiss Count VI is therefore denied. *Cf. Hukic v. Aurora Loan Servs., Inc.*, No. 05 C 4950, 2006 WL 1457787, at *6 (N.D. Ill. May 22, 2006) (denying motion to dismiss separate claims for punitive damages and holding that counts should remain "for the purposes of simplicity").

**CONCLUSION**

As discussed above, Count I is dismissed only to the extent it purports to state a cause of action based on Druckzentrum's claim of being Motorola's exclusive EMEA print supplier or to the extent Druckzentrum claims a breach that occurred prior to the

execution of the NIA.  The remainder of Motorola's Motion to Dismiss is denied as to all

counts.

Date: _June 30, 2010_

6-30-2010

JOHN W. DARRAH
United States District Court Judge