cc

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| DRUCKZENTRUM HARRY JUNG GmbH & Co. KG, | ) | |
| Plaintiff, | ) | |
| v. | ) | Case No. 09-CV-7231 |
| MOTOROLA, INC., | ) | Judge John W. Darrah |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Druckzentrum Harry Jung GmbH & Co. KG ("DHJ") filed a Complaint against Defendant Motorola, Inc. on November 18, 2009, and amended its Complaint against Motorola on March 23, 2010. In its Amended Complaint, DHJ alleged claims of breach of contract and various theories of fraudulent misrepresentation. Motorola moved to dismiss the Amended Complaint pursuant to Fed. R. Civ. P. 12(b)(6); however, the motion was granted in part and denied in part, dismissing DHJ's breach-of-contract claims based on: (1) DHJ's claim of being Motorola's exclusive supplier under their agreement and (2) DHJ's claim that a breach of contract occurred prior to the execution of an agreement on January 31, 2008. *Druckzentrum Harry Jung GmbH & Co. KG v. Motorola, Inc.*, No. 09-cv-7231, 2010 WL 2680116, at *10 (N.D. Ill. June 30, 2010). After discovery was completed, Motorola moved for summary judgment on all counts in the Amended Complaint; that motion has been fully briefed and is ripe for ruling.

## BACKGROUND

Local Rule 56.1(a)(3) requires the party moving for summary judgment to provide "a statement of material facts as to which the moving party contends there is no genuine issue." Rule 56.1(b)(3) then requires the nonmoving party to admit or deny each factual statement proffered by the moving party and to concisely designate any material facts that establish a genuine dispute for trial. *See Schrott v. Bristol-Myers Squibb Co.*, 403 F.3d 940, 944 (7th Cir. 2005). A litigant's failure to dispute the facts set forth in an opponent's statement in the manner dictated by Local Rule 56.1 results in those facts' being deemed admitted for purposes of summary judgment. *Smith v. Lamz*, 321 F.3d 680, 683 (7th Cir. 2003).

Local Rule 56.1(b)(3)(C) permits additional material facts to be provided by the nonmoving party. Local Rule 56.1(a)(3) then allows the moving party to submit a concise reply to these additional facts. Rule 56.1 requires statements of facts to consist of short, numbered paragraphs. To the extent that a response to a statement of material fact provides only extraneous or argumentative information, this response will not constitute a proper denial of the fact, and the fact will be admitted. *See Graziana v. Village of Oak Park*, 401 F. Supp. 2d 918, 937 (N.D. Ill. 2005). Similarly, to the extent that a statement of fact contains a legal conclusion or otherwise unsupported statement, including a fact which relies upon inadmissible hearsay, such a fact is disregarded. *Eisenstadt v. Centel Corp.*, 113 F.3d 738, 742 (7th Cir. 1997).

The following is taken from the parties' statements of undisputed material facts submitted in accordance with Local Rule 56.1. Motorola is a Delaware corporation with

its principal place of business in Illinois; Motorola creates and sells mobile devices. (Def.'s 56.1(a)(3) Statement ¶ 1.) Motorola distributes printed materials, which accompany the mobile devices it sells. (*Id.*) DHJ is a German printing company with its principal place of business in Flensburg, Germany. (*Id.* ¶ 2.) For a period of time, DHJ provided Motorola with printed materials to accompany Motorola's mobile devices. (*Id.*) DHJ filed for insolvency in the German court system on October 1, 2011; a court-appointed trustee is pursuing the claims in this litigation on behalf of DHJ's creditors. (*Id.*) Jurisdiction in this dispute is premised on the diversity of the parties pursuant to 28 U.S.C. § 1332; the amount in controversy also exceeds $75,000.00. (*Id.* ¶ 3.)

DHJ began providing Motorola with print materials as early as 1995 or 1996. (*Id.* ¶ 4.) In 2007, Motorola implemented a new process by which suppliers could bid on work from Motorola; this process, the "Rapid Sourcing Initiative," was implemented to optimize Motorola's supply chain for its packaging and printing needs. (*Id.* ¶¶ 5-6.) By implementing the Rapid Sourcing Initiative process, Motorola would likely reduce the number of suppliers with whom it contracted and obtain lower pricing for various print and packaging materials Motorola consumed. (Pl.'s 56.1(b)(3)(C) ¶¶ 3-4.)

DHJ was invited to participate in the Rapid Sourcing Initiative bidding process and, in order to participate, executed a Corporate Supply Agreement ("CSA") with Motorola on October 4, 2007. (Def.'s 56.1(a)(3) Statement ¶ 7.) Motorola informed DHJ that it would be required to agree to all of the terms of the CSA prior to receiving an award of business. (Pl.'s 56.1(b)(3)(C) ¶ 9.) The CSA defined the term "forecast" as "Motorola's nonbinding, advance calculation of its future requirements." (Def.'s

56.1(a)(3) Statement ¶ 8.) The CSA also permitted Motorola to terminate the agreement between the parties "for convenience upon ninety (90) days' prior written notice to Supplier." (*Id.* ¶ 9.)

DHJ participated in two Rapid Sourcing Initiative workshops at Motorola, and DHJ was one of several print suppliers to participate in the bidding process. (*Id.* ¶ 10.) During the Rapid Sourcing Initiative process, Motorola brought in global suppliers to compete with local suppliers. (Pl.'s 56.1(b)(3)(C) ¶ 8.) In bidding on work through the Rapid Sourcing Initiative, a supplier had to bid on all of the products within a segment, rather than simply bidding on the most profitable products. (*Id.* ¶¶ 12-13.) When DHJ submitted its bid in November 2007, the price of its bid contemplated production of over 25 million landscape user guides for mobile phones and over 19 million "quick start" and accessory guides. (*Id.* ¶ 15.) DHJ alleges it was informed at the first workshop that Motorola forecasted to sell at least 37 million cell phones within the Europe, Middle East, and Africa ("EMEA") regions. (Def.'s 56.1(a)(3) Statement ¶ 11.)[1] The number of phone units sold corresponded to the number of manuals the print supplier would be required to provide. DHJ's Sales Manager, Roger Pilz, testified at his deposition that the forecast of 37 million phones was not a lie propounded by Motorola, rather, Pilz testified, that Motorola's forecast was "just wrong." (*Id.* ¶ 12.) Pilz further testified that Motorola never promised or guaranteed the sale of 37 million phones in the EMEA region. (*Id.* ¶ 13.)

[1] DHJ claims it was led to believe that if it won the EMEA award, it would be the exclusive printer for the EMEA region; Motorola denies this point. (*See* Pl.'s 56.1(b)(3)(C) ¶¶ 10-11.)

On January 22, 2008, Motorola issued a Notification of Initial Award ("NIA") to DHJ; the NIA was signed by Motorola's David Buck on January 23, 2008. (*Id.* ¶ 15.) The NIA defined the "Initial Award" as: "a 2007 Packaging and Print [Rapid Source Initiative] award of business to [DHJ] that represents a targeted percentage of Motorola's total Packaging and Print [Rapid Source Initiative] Spend in the designated Segment(s), and that may be comprised of Base Share, Swing Spend, or a combination of the two." (*Id.* ¶ 16.) "Base Share" was defined as a: "targeted percentage of Motorola's Packaging and Print [Rapid Source Initiative] Spend in the Segment(s)." (*Id.* ¶ 17.) "Swing Spend" was defined as: "potential additional percentage of Packaging and Print [Rapid Source Initiative] Spend above the Base Share that may be awarded by Motorola, in its sole discretion, based on [DHJ]'s compliance with the CSA . . . the Award terms, [DHJ's] performance, and other strategic Motorola business considerations." (*Id.*) The instructions for bidding given to DHJ and other suppliers indicated that an award issued by Motorola would include a Base Share, defined as "a committed share of spend from Motorola for the duration of the contract period." (Pl.'s 56.1(b)(3)(C) ¶ 16.)

Motorola awarded DHJ a Minor Award of "2% of Base Share for the Print Segment with up to an additional 8% Swing Spend," provided DHJ met Motorola's qualifications. (Def.'s 56.1(a)(3) Statement ¶ 19.) The NIA awarded to DHJ also stated that:

> Motorola will use good faith efforts to award Products to [DHJ] that in the aggregate, are reasonably likely to achieve the target percentage identified in the Initial Award. However, the actual percentage realized by [DHJ] may vary from the target percentage . . . . Motorola is not liable, and [DHJ] will have no claim against Motorola, for any percentage variance from the target percentage identified in the Initial Award."

(*Id.* ¶ 20.) The NIA could be terminated on the same grounds and by the same process as that provided for in the CSA: Motorola could terminate upon "ninety days prior written notice to supplier." (*Id.* ¶ 21.) The NIA provided that "[t]his Agreement is the entire understanding between the parties concerning the Initial Award and supersedes all earlier discussions, agreements and representations regarding this Initial Award." (*Id.* ¶ 22.) Though DHJ was awarded the NIA in January 2008, DHJ's CEO, Harry Gall, did not execute the NIA prior to April 10, 2008; Gall testified that he waited to sign the NIA on behalf of DHJ until after pricing issues were resolved. (*Id.* ¶¶ 23-24.)

Before DHJ could supply Motorola with printed materials, the parties had to negotiate prices for specific parts and complete the qualification process for these parts. (*Id.* ¶ 25.) Jenny Jun was Motorola's print and packaging Category Manager; in this role, she negotiated the prices with DHJ until the prices were finalized. (*Id.* ¶ 26.) During the course of price negotiations, Motorola provided updated forecasts on some, but not all, products DHJ sought to supply to Motorola. (*Id.* ¶ 28.) Motorola operated a Two-Way Schedule Sharing System that provided weekly updates to volume forecasts for parts to be supplied to Motorola; suppliers like DHJ had access to the Sharing System, though it is unclear that DHJ was aware that it should use the system to obtain updated forecasts. (*Id.* ¶¶ 31-32.) It is apparent that in March 2008, Pilz was aware that Motorola's product demand had decreased, identifying that as the reason DHJ increased their price bids on some products. (*Id.* ¶ 35.) On March 20, 2008, DHJ received an updated three-month volume forecast from Motorola's local buyer, while DHJ was still negotiating prices with

Motorola. (*Id.* ¶ 36.) Final pricing on the print products was agreed to by Motorola and DHJ on April 9, 2008, at the earliest. (*Id.* ¶ 40.)

Motorola's Director of Battery, Power and Packaging Commodity Management, Mary Sloan, prepared a summary chart to reflect Motorola's total print and packaging spend for mobile devices, by month, from October 1, 2007 through September 30, 2009; however, DHJ disputes the accuracy of this data. DHJ argues that Sloan's chart indicates Motorola did not provide DHJ with 2 percent or more of Motorola's spend for some of the quarters of the contract. (Pl.'s 56.1(b)(3)(C) ¶ 31.) However, Motorola disputes the term of the contract. Motorola claims the contract was terminated earlier than when DHJ claims; Motorola also claims that the quarterly spends were irrelevant, because the 2% spend was to be considered on an aggregate basis. Sloan's chart, showing Motorola's spend paid to DHJ, was in U.S. dollars; however, Motorola paid DHJ for its work in Euros. (*Id.* ¶ 32.) Both Pilz and Gall were unaware of what Motorola's total print spend was or what DHJ's share of the spend was for the period of October 2007 through September 2009. (Def.'s 56.1(a)(3) Statement ¶¶ 51-52.)

In 2008, Motorola experienced significant declines in production and sales of its mobile devices in the EMEA region; these declines were made public by January 2008. (*Id.* ¶ 53.) On November 18, 2008, Pilz received an email from Petra Lorenzen, a buyer for Motorola; Lorenzen indicated in the email that "From January 2009 onwards materials procurement for the European MDB [Mobile Device Business] division will be transferred from Flensburg to Asia, and by the end of the first quarter it will be fully supported by direct-ship from Asia." (*Id.* ¶ 54.) DHJ worked with Motorola during its

transition phase out of Europe, providing support through March 25, 2009. (*Id.* ¶ 58.) DHJ received 60,000.00 Euros from Motorola for excess materials. (*Id.*) On March 25, 2009, DHJ received word from Motorola (via email) that its last orders had been placed with DHJ. (*Id.* ¶ 60, Pl.'s Ex. 13.) DHJ issued a Notice of Cancellation of the contract (the CSA and the NIA) to Motorola on April 24, 2009. (Pl.'s 56.1(b)(3)(C) ¶ 29.) In 2009, Motorola's Flensburg facility was shut down, and all of its employees were laid off. (Def.'s 56.1(a)(3) Statement ¶ 61.)

## LEGAL STANDARD

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the initial responsibility of informing the court of the basis for its motion and identifying the evidence it believes demonstrates the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). If the moving party meets this burden, the nonmoving party cannot rest on conclusory pleadings but, rather, "must present sufficient evidence to show the existence of each element of its case on which it will bear the burden at trial." *Serfecz v. Jewel Food Stores*, 67 F.3d 591, 596 (7th Cir. 1995) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986)). A mere scintilla of evidence is not enough to oppose a motion for summary judgment, nor is a metaphysical doubt as to the material facts. *Robin v. Espo Eng. Corp.*, 200 F.3d 1081, 1088 (7th Cir. 2000) (citations omitted). Rather, the evidence must be such "that a reasonable jury could return a verdict for the

nonmoving party." *Pugh v. City of Attica, Ind.*, 259 F.3d 619, 625 (7th Cir. 2001) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (*Anderson*)).

In considering a motion for summary judgment, the court must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in the nonmoving party's favor. *Abdullahi v. City of Madison*, 423 F.3d 763, 773 (7th Cir. 2005) (citing *Anderson*, 477 U.S. at 255). The court does not make credibility determinations or weigh conflicting evidence. *Id.*

## ANALYSIS

### *Breach of Contract*

Motorola argues that no genuine issue of material fact remains regarding its purported breach of contract with DHJ. Rather, Motorola maintains that it is entitled to judgment as a matter of law, arguing DHJ cannot prove a breach-of-contract theory such that a reasonable jury could return a verdict in favor of DHJ. Motorola frames the breach of contract into two discrete issues: (1) whether Motorola made a good-faith effort to purchase 2% of its print needs from DHJ during the relevant time period and (2) whether Motorola improperly terminated the NIA early. (Def.'s Mem. at 5-6.) The Court, in its Opinion ruling on Motorola's Motion to Dismiss, provided: "to the extent [DHJ]'s breach-of-contract claim is premised on Motorola's purported failure to provide 100% of EMEA print business to [DHJ] over the contract period," that claim was dismissed. *Druckzentrum Harry Jung GmbH & Co. KG v. Motorola, Inc.*, No. 09-cv-7231, 2010 WL 2680116, at *6 (N.D. Ill. June 30, 2010). DHJ is barred from raising exclusivity as a

basis of its breach-of-contract claim, and DHJ is further barred from claiming a breach occurred prior to the execution of the NIA on January 31, 2008. *Id.* at *8.

DHJ, in its Response to Motorola's Motion for Summary Judgment, points to four different arguments to support its breach-of-contract claim. DHJ's first argument, that the effective date of the NIA was October 1, 2007, is unavailing. (Pl.'s Resp. at 3.) This argument was already dismissed in the Court's previous opinion, as the Court ruled that DHJ could not allege a breach "occurred prior to the execution of the NIA." *Druckzentrum Harry Jung GmbH & Co. KG v. Motorola, Inc.*, No. 09-cv-7231, 2010 WL 2680116, at *8 (N.D. Ill. June 30, 2010). However, DHJ maintains other genuine issues of material fact remain regarding its breach-of-contract claim against Motorola. Each argument is considered in turn.

<u>Termination of the Contract</u>

In support of its breach-of-contract claim, DHJ alleges Motorola breached the terms of the contract by failing to properly terminate the contract. The CSA (which is incorporated by the NIA) provides that "Motorola may terminate for convenience upon ninety days prior written notice to Supplier." (Def.'s Ex. F, ¶ 2.2d.) DHJ alleges Motorola improperly terminated the agreement because, in part, the notice DHJ received did not specifically use the word "termination." (Pl.'s Resp. at 9.) DHJ's focus on this fact is ineffective: management at DHJ received an email from Motorola on November 18, 2008, stating: "the Flensburg CFC activities concluded at the end of the first quarter of 2009 . . . . From January 2009 onwards materials procurement for the European MDB division will be transferred from Flensburg to Asia, and by the end of the first quarter it

will be fully supported by direct-ship from Asia." (Def.'s Ex. B at 279:20 – 280:8.) Pilz characterized this email as the "first proof in writing" from Motorola's buying team in Flensburg that Motorola would no longer be purchasing DHJ's products. (*Id.* at 281:1 – 281:13.) DHJ fails to even acknowledge this notice in its response to the Motion for Summary Judgment, other than to state that the correspondence failed to use the word "termination." However, this correspondence from Motorola manifestly intended to terminate the agreement, and DHJ's management testified that it acknowledged it as such. Therefore, to the extent DHJ claims Motorola breached the contract by failing to properly terminate the NIA, summary judgment is granted in Motorola's favor, and the breach-of-contract claim is rejected on this ground.

Awarding 2% of the Base Share to DHJ

Motorola awarded DHJ a Minor NIA Award of 2% of Base Share for the Print Segment, with up to an additional 8% Swing Spend. From the period of April 2008 through September 2009, Motorola posits, DHJ received 2.4% of Motorola's aggregate global print and packaging spend. (Def.'s Mem. at 7.) DHJ disputes the numbers suggested by Motorola.[2] Moreover, DHJ argues that no evidence indicates that the NIA intended for the 2% base share to be calculated on an aggregate, rather than quarterly, basis.

---

[2] DHJ also submitted an affidavit from its counsel, Attorney Carl Liggio. Liggio testifies that issues of "credibility" remain with regard to Motorola's spend, and provides that the numbers are "likely to be materially understated." However, this report created by Liggio in support of DHJ's claims is immaterial. "A party to a lawsuit cannot ward off summary judgment with an affidavit or deposition based on rumor or conjecture." *Palucki v. Sears, Roebuck & Co.*, 879 F.2d 1568, 1572 (7th Cir. 1989) (citing Fed. R. Civ. P. 56(e) and noting that a non-witness expert cannot testify to matters of which he lacks personal knowledge).

In support of DHJ's argument that the 2% base share should have been calculated on a quarterly basis, DHJ relies on language in the "Pricing" section of the NIA, which states that "quarter-on-quarter price adjustments for all Products will be negotiated by the parties using the RSI process." (Def.'s Ex. J, NIA ¶ 4d.) This language does not clearly indicate that the 2% spend was to be determined on a quarterly basis but, rather, that the prices for the products DHJ was selling to Motorola would be reassessed on a quarterly basis. DHJ apparently ignores the language in "The Initial Award" section of the NIA, which provides: "Motorola will use good faith efforts to award Products to [DHJ] that **in the aggregate**, are reasonably likely to achieve the target percentage identified in the Initial Award." (*Id.* ¶ 2b.) (emphasis added). The NIA does not indicate that the 2% share would be determined on a quarterly basis, and DHJ cannot support that argument.

DHJ submits testimony from a Motorola employee, Adriana Camara, who stated that the 2% share was to be evaluated on a quarterly basis. However, Camara further explained that "the award was base[d] on a percentage of the Motorola spend for print globally and for the period of the contract and that was going to be review[ed] in a quarterly basis with the Category Managers." (Def.'s Ex. Z at 44:10-23.) This testimony demonstrates that the 2% spend was to be based on the *aggregate*, for the period of the contract, though Motorola's spend would be reviewed each quarter. DHJ's argument that the 2% spend was intended to be based on a quarterly basis is unavailing and contradictory to the clear terms of the NIA.

DHJ also disputes the numbers presented by Motorola in support of their position that DHJ received 2% of the spend on an aggregate basis, characterizing the data as

"unreliable and inaccurate." (Pl.'s Resp. at 5 n.3.) Motorola argues that its data supports its argument that it provided DHJ with an aggregate spend exceeding 2%. Regardless, there was no absolute requirement that DHJ be provided with 2% of Motorola's print spend; rather, the terms of the NIA simply required Motorola to use "good faith efforts" that would make it reasonably likely for DHJ to receive 2% of the print spend.

Good Faith in Awarding DHJ Business

Even if DHJ were able to convince a jury Motorola failed to award the 2% spend to it, this would be inadequate to support its breach-of-contract claim. However, the NIA specifically required Motorola to exhaust good-faith efforts in attempting to give DHJ that spend. The NIA specifically stated:

> Motorola will use **good faith efforts** to award Products to [DHJ] that in the aggregate, are reasonably likely to achieve the target percentage identified in the Initial Award. However, the actual percentage realized by [DHJ] may vary from the target percentage . . . . Motorola is not liable, and [DHJ] will have no claim against Motorola, for any percentage variance from the target percentage identified in the Initial Award.

(Def.'s 56.1(a)(3) Statement ¶ 20.) (emphasis added). DHJ also argues that Motorola failed to exercise good faith in awarding DHJ its spend under the NIA, because Motorola moved its business to China.

In order to prove a breach of contract, DHJ would need to show Motorola failed to act in good faith, thus depriving DHJ of its 2% spend award under the NIA. DHJ argues that a question of fact remains as to whether or not Motorola acted in good faith to secure a 2% spend for DHJ. In support of this position, DHJ raises the issue that Motorola chose to move business from DHJ to other suppliers in China, despite Motorola's obligation under the NIA to make good-faith efforts to award products to

DHJ to achieve the target percentage stated under the NIA. To establish a breach of good faith, a party must show: "that the contract vested the opposing party with discretion in performing an obligation under the contract and the opposing party exercised that discretion in bad faith, unreasonably, or in a manner inconsistent with the reasonable expectations of the parties." *LaSalle Bank Nat'l Assoc. v. Paramount Properties*, 588 F. Supp. 2d 840, 857 (N.D. Ill. 2008) (citations omitted).

However, no factual question remains as to whether or not Motorola acted in good faith under the contract. Nothing in the NIA expressly prohibited Motorola from transferring its print business to other suppliers in China or otherwise changing its business model. The contract provided that "Motorola is not liable and [DHJ] will have no claim against Motorola" if Motorola failed to meet the 2% target due to changes in the business environment. DHJ alleges no facts and presents no evidence that Motorola acted in bad faith or with intent to harm DHJ when it moved its business away from DHJ's operations in Germany. Also, as discussed above, Motorola had the right to terminate the agreement with 90 days' notice, which it did. Therefore, summary judgment is also granted as to this basis for DHJ's breach-of-contract claim; DHJ cannot demonstrate that Motorola acted in a manner inconsistent with DHJ's reasonable expectations by transferring its print business to China during the economic downturn.

*Fraudulent Misrepresentation*

The remaining claims[3] in DHJ's Amended Complaint, Counts II through V, allege fraudulent representation on the part of Motorola. First, Count II alleges Motorola knowingly inflated a forecast of phone sales in the EMEA region in order to acquire more favorable pricing from DHJ. (Am. Compl. ¶¶ 225-241.) Count III presents an alternative theory, alleging that because Motorola knowingly misrepresented their sales forecasts in the EMEA region, DHJ lost money on the millions of manuals it was prevented from printing based on Motorola's false forecast. (Am. Compl. ¶¶ 242-244.) Count IV of the Amended Complaint alleges individuals from Motorola made statements to DHJ employees, implying that Motorola's orders for printed materials would increase to "induce [DHJ] to continue printing materials for Motorola for the EMEA region at unreasonably low prices." (Am. Compl. ¶¶ 250-251.) Finally, Count V alleges Motorola provided a forecast, indicating a need for print materials to accompany 37 million phones, yet knew its sales volumes were declining and failed to notify DHJ of the decline. (Am. Compl. ¶¶ 262-273.) Neither Motorola in its Motion for Summary Judgment nor DHJ address these counts for fraudulent misrepresentation individually. Rather, DHJ's response focuses solely on Count V, arguing that Motorola never provided revised sales volume forecasts, despite its obligation to do so. (Pl.'s Resp. at 11.) Moreover, DHJ seems to expressly disclaim Counts II and III (and possibly Count IV) of

[3] Count VI of the Amended Complaint was merely a request for punitive damages; as discussed in the previous opinion, this count is being construed as prayer for relief.

the Amended Complaint in its Response, stating it "does not claim that the initial volume forecasts were fraudulent." (Pl.'s Resp. at 11.)

"The elements of fraudulent misrepresentation include: (1) a false statement of material fact; (2) known or believed to be false by the party making it; (3) with the intent to induce the other party to act; (4) the other party's justifiable reliance on the truth of the statement; and (5) damages resulting from reliance on the statement." *BP Amoco Chemical Co. v. Flint Hill Resources, LLC*, 615 F. Supp. 2d 765, 784 (N.D. Ill. 2009) (citations omitted). A claim of fraudulent misrepresentation requires proof of clear and convincing evidence rather than a mere preponderance of evidence. *BPI Energy Holdings, Inc. v. IEC (Montgomery), LLC,* 664 F.3d 131, 137 (7th Cir. 2011).

DHJ's allegations of fraudulent misrepresentation fail because DHJ has presented no evidence that Motorola knowingly submitted false information to DHJ regarding its sales forecasts. Instead, DHJ insists that Motorola was obligated to provide forecast revisions "in the same format as they were initially provided . . . ." (Pl.'s Resp. at 11.) DHJ presents no case law to support this assertion. Nor can DHJ point to any provision, in the CSA or NIA, requiring an updated forecast given to DHJ in the same format as they were initially provided. Significantly, Motorola *did* provide weekly updates to its forecasts with its Two-Way Schedule Sharing System; and suppliers, like DHJ, had access to this system. Even if the Two-Way Schedule Sharing System did not, perhaps, provide information in the exact same format as the initial forecast, it is apparent that Motorola made efforts to update their forecasts and provide suppliers, like DHJ, with updated information on a regular basis. Pilz admitted he was aware that Motorola's

product demand had decreased, which was the reason DHJ increased their price bids on some products in March 2008. Pilz further testified that he did not believe the employees at Motorola were lying about the forecast numbers.

DHJ fails to provide any evidence that Motorola knowingly misled DHJ about its sales forecasts in an attempt to induce them to reduce pricing or otherwise enter into an agreement with them. Rather, DHJ's fraudulent-misrepresentation claim now hinges on whether or not the forecast numbers were submitted in the same format as the original forecast numbers. Even if the forecasts were provided in different formats, DHJ cannot explain how this fact is enough to establish a claim of fraudulent misrepresentation. To find Motorola fraudulently misrepresented forecasts because it presented them in a different format (on a weekly basis) would be improper and unsupported by the case law. Therefore, Motorola's Motion for Summary Judgment on all of DHJ's claims of fraudulent misrepresentation is granted.

## CONCLUSION

In light of the foregoing analysis, Motorola's Motion for Summary Judgment is granted as to Count I for DHJ's claim of breach of contract and as to Counts II through V on DHJ's claims of fraudulent misrepresentation.

Date: 8-9-12

JOHN W. DARRAH
United States District Court Judge